UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LAMAR BIGSBY, JR., KARLA FREELAND,
MARIA BRANDT, KATHLEEN MURRY, and
HERMAN GRIMES, on behalf of
themselves and all others similarly
situated,

                    Plaintiffs,

       - against -

BARCLAYS CAPITAL REAL ESTATE, INC.,
doing business as HOMEQ SERVICING,

                    Defendant.

14-cv-1398 (JGK)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#_____
DATE FILED: 3/28/18

---

JOHN G. KOELTL, District Judge:

Lamar Bigsby, Jr., and Karla Freeland first filed this
putative class action against Barclays Capital Real Estate,
Inc., in its capacity as successor to a mortgage-servicing
company known as HomEq Servicing Corp., over four years ago.
Dkt. No. 2; see Dkt. No. 22. Bigsby and Freeland alleged that
Barclays and HomEq defrauded mortgagors in the assessment of
foreclosure-related fees, giving rise to claims under the
Racketeer Influenced and Corrupt Organizations Act ("RICO") and
related common law claims. Barclays previously filed a motion to
dismiss the complaint by Bigsby and Freeland pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure. The Court
granted that motion in part, resulting in the dismissal of the
RICO claims by Bigsby and Freeland. Bigsby v. Barclays Capital
Real Estate, Inc., 170 F. Supp. 3d 568, 572 (S.D.N.Y. 2016).

Bigsby and Freeland, now joined by Maria Brandt, Kathleen Murry, and Herman Grimes (the "California plaintiffs," and together with Bigsby and Freeland, the "plaintiffs"), then filed a Second Amended Complaint, with leave of the Court. Dkt. No. 104 (the "SAC"). The Second Amended Complaint renews the plaintiffs' civil RICO claims predicated on mail fraud and wire fraud, 18 U.S.C. §§ 1341, 1343, 1962, 1964, and common law claims of breach of contract, conversion, fraud, unjust enrichment, constructive trust, and accounting. The Second Amended Complaint also adds statutory claims under California's unfair competition law, Cal. Bus. & Prof. Code § 17200 (the "California UCL claims"), and the California Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 et seq. (the "California fair debt collection claims").

Presently before the Court is a second motion by Barclays to dismiss the plaintiffs' RICO claims, California UCL claims, California fair debt collection claims, common law claims of fraud, conversion, and unjust enrichment, and the California plaintiffs' breach of contract claims. The motion is **granted in part** and **denied in part**.

I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations in the complaint are accepted as true, and all reasonable inferences

must be drawn in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While a court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), a court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Bigsby, 170 F. Supp. 3d at 572. A court may

consider a document referenced in the complaint only if there is no dispute as to its authenticity and there are no "material disputed issues of fact regarding the relevance of the document." Nicosia v. Amazon, Inc., 834 F.3d 220, 231 (2d Cir. 2016).

## II.

The Court accepts as true the following factual allegations from the Second Amended Complaint.

The plaintiffs in this matter, Lamar Bigsby, Jr., Karla D. Freeland, Maria R. Brandt, Kathleen Murry, and Herman Grimes, were mortgagors. Bigsby was a resident of Georgia; Freeland was a resident of Massachusetts; and Brandt, Murry, and Grimes were residents of California. SAC ¶¶ 9-13.

The plaintiffs have sued Barclays, a Delaware corporation with its principal place of business in New York, in its capacity as successor to HomEq. Barclays acquired HomEq, a mortgage-servicing company, in 2006. HomEq collected on home loans on behalf of mortgage-note holders, who were typically trustees and beneficiaries of securitized loans. SAC ¶¶ 2, 14, 17, 26. After acquiring HomEq, Barclays continued to operate HomEq using the same employees, guidelines, and business strategies. SAC ¶ 27. HomEq and Barclays serviced note holders' loans pursuant to a Pooling and Servicing Agreement (a "PSA"). SAC ¶¶ 16, 26, 122. Under a PSA, a note holder assigned to HomEq

and Barclays certain ownership rights of the note, including the right to foreclose on delinquent mortgages. See SAC ¶¶ 28, 57, 59, 123.

Each plaintiff obtained at least one mortgage serviced by HomEq and Barclays. SAC ¶¶ 48-49, 53, 148, 153, 206-08, 225-27, 243-45. All of the plaintiffs went into default on their mortgage obligations, and Barclays instituted foreclosure proceedings against them. This case deals with Barclays's conduct during those foreclosure proceedings.

## A.

The claims and factual allegations in the Second Amended Complaint are organized around three allegedly fraudulent schemes perpetrated by Barclays in foreclosure proceedings -- a "fraudulent foreclosure scheme," a "fee shifting scheme," and an "inflated fees scheme." The plaintiffs allege that these schemes caused them "to pay the illegal amounts sought by Barclays, and . . . incur[] legal and other expenses associated with the illegal activity." SAC ¶ 298.

## 1.

Bigsby, Freeland, Brandt, and Grimes allege that Barclays and others engaged in a "fraudulent foreclosure scheme." SAC ¶¶ 276-77.[1]

---

[1] Murry does not appear to allege that she was subject to the "fraudulent foreclosure scheme."

The plaintiffs assert that this scheme involved Barclays and others identifying an entity as the assignee of the security instrument that bore the beneficial ownership interest in the mortgage note "at the time of the commencement of foreclosure, when the Deed of Trust or Mortgage [was] not assigned until after the [foreclosure] action was initiated." SAC ¶ 276. This scheme allegedly permitted Barclays to assert standing in foreclosure actions on behalf of its note-holder clients before those clients had in fact acquired standing through the recording of the assignment of the ownership interest in the note.

**2.**

The plaintiffs also allege that Barclays and others engaged in a fraudulent "fee shifting scheme." SAC ¶¶ 265-72.

Barclays used an "outsourcing" model to hire counsel for all of the foreclosure and bankruptcy proceedings at issue in this case. SAC ¶¶ 28-30. Under this model, Barclays entered into a Master Servicing Agreement with a non-legal entity -- often Fidelity National Foreclosure Solutions -- which provided that Fidelity would serve as Barclays's representative in dealings with local foreclosure and bankruptcy counsel. SAC ¶¶ 2, 29-31, 33. Fidelity agreed to be "solely responsible . . . for local counsel's performance" in the bankruptcy and foreclosure actions. SAC ¶ 34. In exchange, the Master Servicing Agreement

6

provided that Barclays would pay Fidelity a fee for each bankruptcy and foreclosure Fidelity arranged and monitored, as well as a continuing fee for each foreclosure (assessed every six months) so long as the mortgagor was "reasonably performing" on a payment plan. SAC ¶ 39. Fidelity also entered into retainer agreements with bankruptcy and foreclosure counsel, which provided that counsel would pay fees to Fidelity for each mortgage referred to counsel out of funds counsel received from the client. SAC ¶¶ 40-41.

The loan documents for the plaintiffs' mortgages were standard forms issued by Fannie Mae and Freddie Mac. These forms permitted Barclays to assess various fees associated with foreclosure costs against mortgagors in default. See SAC ¶¶ 51, 150. Some of the foreclosure-related fees Barclays assessed against the plaintiffs that were listed as "attorney's fees" or "legal fees," were ostensibly designed to pass only the cost of foreclosure and bankruptcy counsel onto defaulting mortgagors. SAC ¶¶ 43-44, 163, 172, 178, 191, 216-17, 233, 235, 253. The plaintiffs allege that Barclays surreptitiously used these "attorney's fees" or "legal fees" not just to pass onto mortgagors the cost of counsel but also to pass on the cost of hiring Fidelity to serve as an intermediary with counsel on Barclay's behalf. SAC ¶¶ 269-70.

Bigsby and Freeland alleged RICO claims premised on a
similar "fee shifting scheme" in their first amended complaint.
Dkt. No. 22 ¶¶ 173-79. The Court dismissed those RICO claims on
Barclays's prior motion to dismiss primarily because Bigsby and
Freeland failed to allege claims of fraud and scienter. Bigsby,
170 F. Supp. 3d at 573-74, 576-77, 578-79. The "fee shifting
scheme" alleged in the operative Second Amended Complaint is
exactly the same as the "fee shifting scheme" the Court
dismissed previously with one addition: The plaintiffs now
allege that Barclays and Fidelity entered into an indemnity
agreement dated April 9, 2009, as part of the scheme. SAC ¶ 268;
see SAC ¶¶ 33-47, 265-72. This agreement provided that Fidelity
will hold Barclays harmless for "[a]ny allegations that the
business model employed by [Fidelity] . . . constitutes an
impermissible 'fee splitting' or 'referral fee' arrangement."
SAC ¶ Ex. C; see SAC ¶ 268.

### 3.

Finally, the plaintiffs allege that Barclays and others
engaged in a fraudulent "inflated fees scheme." SAC ¶¶ 273-75.

The Master Servicing Agreement between Barclays and
Fidelity contained a schedule of maximum fees that Fidelity was
authorized to charge in the event of a bankruptcy. SAC ¶¶ 37-38,
273. Fidelity and foreclosure counsel also entered into retainer
agreements that contained schedules for the foreclosure-related

fees counsel was permitted to charge Barclays. SAC ¶¶ 40-41, 273. The plaintiffs allege that Fidelity and foreclosure counsel knowingly charged Barclays fees in excess of the maximum limits set by the Master Servicing Agreement and the retainer agreements, and that Barclays passed these inflated fees onto the defaulting mortgagors. SAC ¶ 274; see SAC ¶¶ 58, 64, 74, 80, 89, 93-94, 99-100, 133, 163, 169, 178-79, 183, 186, 191-92, 212-17, 237, 258. The plaintiffs allege that Barclays benefitted from this scheme "by not having to have a department of employees analyzing legal bills to make sure they were in conformity with the maximum allowable fees." SAC ¶ 275.

**B.**

The plaintiffs allege that they were victims of all three fraudulent schemes.

In 2005, Bigsby obtained two mortgages, secured by his home in Stockbridge, Georgia, from Freemont Investment and Loan Co., with Mortgage Electronic Registration Systems ("MERS") serving as nominee. SAC ¶¶ 48-49. Bigsby went into default on his mortgages in or about the latter part of 2006. SAC ¶ 54. Barclays initiated foreclosure proceedings against Bigsby on November 8, 2006, on behalf of "U.S. Bank National Association, as Trustee." SAC ¶ 55. U.S. Bank National Association had not been assigned the note or Deed of Trust for Bigsby's property when the Bigsby foreclosure was initiated. SAC ¶ 57. The

document assigning the Note and Security Deed for Bigsby's property from MERS to U.S. Bank National Association was prepared and executed on December 14, 2006. SAC ¶ 62. All of the correspondence between Barclays, foreclosure counsel, and Bigsby through October of 2009 related to the foreclosure listed MERS as Barclays's client and creditor on Bigsby's loan. SAC ¶¶ 86, 91, 96, 102, 106, 109-12, 115. Barclays first stated that U.S. Bank National Association was the creditor for Bigsby's loan on October 22, 2009. SAC ¶ 117. Barclays sold Bigsby's house in foreclosure to U.S. Bank National Association on May 4, 2010. SAC ¶ 132. Bigsby alleges that Barclays charged him fraudulent fees associated with foreclosure costs on multiple occasions between November 29, 2006, and October 22, 2009. SAC ¶¶ 56, 63, 71, 77, 88, 92, 97, 116, 127.

In 2004, Freeland obtained a mortgage secured by her home in Plymouth, Massachusetts, from Aames Funding Corp. SAC ¶ 148. Freeland went into default on her mortgage in or about the first half of 2006. SAC ¶¶ 154, 158. Barclays initiated foreclosure proceedings against Freeland on July 14, 2006, on behalf of "Deutsche Bank National Trust Co[.], as Trustee." SAC ¶ 158. Deutsche Bank National Trust Co. did not hold the note or mortgage to Freeland's property when the Freeland foreclosure was initiated. SAC ¶¶ 159, 174. On March 12, 2007, Barclays, through counsel, recorded an Assignment of Mortgage transferring

the beneficial interest in Freeland's mortgage to Deutsche Bank National Trust Co. SAC ¶ 176. The assignment document was dated January 31, 2004, and listed a notarization date of February 6, 2004. Id. Freeland paid off all amounts due on her mortgage and related fees as of May 15, 2013. SAC ¶¶ 194-96. Freeland alleges that Barclays charged her fraudulent fees associated with foreclosure costs on multiple occasions between October 10, 2006, and January 21, 2009. SAC ¶¶ 163, 167, 169, 178-79, 182-83, 185-87, 191-92.

In 2005, Brandt obtained a mortgage from First NLC Financial Services, with MERS serving as nominee. SAC ¶ 207. Brandt went into default on her mortgage at some point before October 2007. SAC ¶¶ 207, 210. Barclays initiated foreclosure proceedings against Brandt on October 16, 2007, naming "Quality Loan Service Corp." as the "original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary." SAC ¶ 210. Barclays knew that Quality Loan Service Corp. was not the "original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary" when the foreclosure began. Id. On February 7, 2008, Barclays filed an assignment of Deed of Trust transferring the interest in Brandt's mortgage to Deutsche Bank National Trust Co. SAC ¶ 212. The assignment document stated that it was signed by a Barclays employee on January 29, 2008, but it was

"backdated to October 14, 2007." Id. Brandt's house was eventually sold by Quality Loan. SAC ¶ 213. Brandt alleges that she paid over $5,000 in allegedly fraudulent fees associated with foreclosure costs as of October, 2016. SAC ¶¶ 216-19.

In the 1990s, Murry obtained a mortgage serviced by HomEq. SAC ¶ 226. Murry was notified that she was in default on her mortgage on or about September 15, 2008, and at some point thereafter foreclosure proceedings were initiated against her. SAC ¶ 228. The Second Amended Complaint does not state which company initially owned Murry's mortgage note or on which company's behalf Barclays initiated the Murry foreclosure. Murry paid off her mortgage loan in full as of September 23, 2009, but Barclays charged her a fee associated with the foreclosure proceedings after that date. SAC ¶ 233. Murry alleges that Barclays charged her fraudulent fees associated with foreclosure costs on multiple occasions between December 23, 2008, and November 24, 2009. SAC ¶¶ 230-33, 235-37.

In 2003, Grimes obtained a mortgage from New Century Mortgage Corporation, with Southland Title serving as trustee. SAC ¶ 244. Grimes defaulted on his mortgage in or around the summer of 2009. SAC ¶ 246. Barclays initiated foreclosure proceedings against Grimes on September 1, 2009, on behalf of "Old Republic," which Barclays listed as "agent for the beneficiary." SAC ¶ 248; see SAC ¶ 244. When the Grimes

foreclosure began, Old Republic did not have the authority to commence the foreclosure and New Century was not the holder of the Deed of Trust. SAC ¶ 248. Barclays executed an assignment of Deed of Trust from New Century to Deutsche Bank National Trust Co., and a Substitution of Trustee substituting Old Republic for Southland Title as trustee on September 2, 2009. SAC ¶ 249. Grimes paid his mortgage in full as of December 18, 2009, but Barclays continued to charge him fees associated with the foreclosure proceedings after that date. SAC ¶¶ 253-56. Grimes alleges that Barclays charged him fraudulent fees associated with foreclosure costs on multiple occasions between December 18, 2009, and February 22, 2010. SAC ¶¶ 253, 255-58.

### III.

### A.

Barclays moves to dismiss the plaintiffs' RICO claims predicated on mail fraud and wire fraud.

18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1964(c) provides that "[a]ny person injured in his business or

property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court."

To state a claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) though a pattern (4) of racketeering activity." DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). "Racketeering activity" encompasses, among other things, any act indictable for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include, for purposes relevant to the present case, acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). To establish a "pattern" of racketeering activity, a plaintiff must plead "at least two predicate acts, [and] show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 97 (2d Cir. 1997) (citing H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)). "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " Id. (quoting H.J. Inc., 492 U.S. at 240); see also 4 K & D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525, 535 (S.D.N.Y. 2014).

A plaintiff who alleges racketeering activity based on the predicate acts of violating the mail or wire fraud statutes must prove three elements: "(1) a scheme to defraud [including scienter], (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." United States v. Greenberg, 835 F.3d 295, 305 (2d Cir. 2016) (quoting United States v. Binday, 804 F.3d 558, 569 (2d Cir. 2015)).

To plead scienter, a plaintiff "must either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing a motive for committing fraud and a clear opportunity for doing so." San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 813 (2d Cir. 1996). "While malice or intent may be averred generally, this is not a 'license to base claims of fraud on speculation and conclusory allegations.' Rather, [a] [p]laintiff must allege facts that give rise to a strong inference of fraudulent intent." Stanley v. OptumInsight, Inc., No. 13-cv-944, 2014 WL 906145, at *6 (N.D.N.Y. Mar. 7, 2014) (quoting Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co., 375 F.3d 168, 187 (2d Cir. 2004)); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

A plaintiff pleading RICO predicate acts sounding in fraud must also satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "specify the statements it claims

were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999).

The statement upon which a fraud claim is predicated must be more than a false promise to fulfill the terms of the agreement. See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996). A plaintiff asserting fraud based on a counterparty's allegedly false promise to perform must "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Id. at 20 (citations omitted); see also Bigsby, 170 F. Supp. 3d at 575-76, 577.

The statement upon which a fraud claim is predicated must also be material to the harm caused to the victim. Moore, 189 F.3d at 169. "A misrepresentation is material to a fraud claim only if it is the type of misrepresentation likely to be deemed significant to a reasonable person considering whether to enter into the transaction." Id. at 170 (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 436, 449 (1976)).

**1.**

Barclays argues that the Second Amended Complaint does not state a RICO claim with respect to the "fraudulent foreclosure scheme" because it is implausible that the foreclosure documents contained any misrepresentation.

The plaintiffs allege that Barclays's representations on the foreclosure documents that certain trusts were the beneficial owners of the plaintiffs' notes at the time of the foreclosures were false because their foreclosures were instituted before the assignments of their mortgages to those trusts were recorded, which the plaintiffs contend is a perquisite to a valid assignment. Barclays argues that the premise of the plaintiffs' argument is flawed because the PSAs effectuated complete transfers of the beneficial interests -- including the right to initiate foreclosure -- of all loans subject to those PSAs even before any mortgage assignments were recorded. Because each foreclosure at issue was allegedly initiated after the associated PSA was executed, Barclays argues that the mortgage assignments to the trusts were valid before the foreclosures began and thus the representations on the foreclosure documents regarding who owned the beneficial interest in the loans were true.[2]

---

[2] Barclays submitted excerpts of the relevant PSAs and links to the full, publicly available PSAs in a letter filed after oral argument.

The Second Circuit Court of Appeals confronted this issue in Rajamin v. Deutsche Bank National Trust Co., 757 F.3d 79 (2d Cir. 2014). The Rajamin plaintiffs argued that their mortgages -- which had been transferred to Deutsche Bank National Trust pursuant to PSAs -- were void because their mortgage assignments were recorded after the closing dates of the assignments under the PSAs. See id. at 91. The Court of Appeals rejected that argument, explaining that "[a] post-closing recordation does not in itself suggest that the assignments were made at the time of the recordation," because, under New York law, "[t]he assignment of a mortgage need not be recorded for the assignment to be valid." Id. (citing MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 84-85 (N.Y. 2006)). Rather, the court found that "[t]he PSAs themselves were sufficient to assign the plaintiffs' obligations to Deutsche Bank as of the assignments' effective dates." Id.

Rajamin compels the conclusion that the foreclosure documents in this case did not contain any false statement. The

Dkt. No. 124; see also Dkt. Nos. 125-26. The plaintiffs do not contest that the PSAs are referenced and relied upon in the Second Amended Complaint. SAC ¶¶ 15, 16, 117, 122, 123, 131, 249, 287; see Chambers, 282 F.3d at 153. And, although they argue that the PSAs may be inadmissible hearsay, the plaintiffs do not and cannot raise any dispute as to the authenticity or relevance of the PSAs -- documents Barclays allegedly used to perpetrate the fraudulent foreclosures. See Nicosia, 834 F.3d at 231. The Court therefore may consider the PSAs on this motion to dismiss. The hearsay argument would also be incorrect because the PSAs, like other contracts, have evidentiary significance by virtue of their binding effect and not because of the truth of what they say. See, e.g., Porter v. United States, No. 13-cv-7332, 2015 WL 1004953, at *1 n.2 (S.D.N.Y. Mar. 3, 2015) (citing Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992)).

PSAs in Rajamin and the PSAs here are similar in all relevant respects. The relevant language from the PSAs in Rajamin was: " 'The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders . . . all the right, title and interest of the Depositor in' the principal and interest on the mortgage loans." Id. (emphasis in Rajamin; quoting § 2.01(a) of a sample PSA). The PSAs in this case contain substantially the same language: "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse, for the benefit of the Certificateholders, all the right, title and interest of the Depositor, including . . . the rights of the Depositor under the Assignment Agreement . . . ." Dkt. No. 124-1. Under Rajamin, that language is sufficient to complete mortgage assignments on the effective date of the PSA regardless of when the assignments are recorded. See Rajamin, 757 F.3d at 91. It is therefore implausible to conclude that the foreclosure documents here were false when they listed the assignees in the PSAs as the beneficial owners of the plaintiffs' mortgage notes.

Another portion of Rajamin underscores the implausibility of the plaintiffs' allegations in this case. The Rajamin court concluded that the plaintiffs did not have standing because

19

their claimed injury -- that the defendants commenced foreclosure proceedings they were not empowered to commence -- was too conjectural or hypothetical. Id. at 85. The court based that conclusion on the fact that the plaintiffs admitted they were in default on their loans and yet failed to allege that any entity other than the defendants had demanded payments on the mortgage notes or instituted or threatened to institute foreclosure proceedings. Id. The court inferred from the absence of any assertion of another claim to the plaintiff's defaulted assets that the plaintiffs' allegations that some entity other than the defendants owned their mortgage notes was not plausible. Id. at 85-86.

Here, the plaintiffs similarly admit that they were in default on their mortgage loans and therefore subject to foreclosure. The plaintiffs also do not assert that any entity other than the trusts that Barclays asserted in the foreclosure documents owned the mortgage notes attempted to claim the plaintiffs' foreclosed assets in the many years between the institution of their foreclosures and the present lawsuit. As in Rajamin, the absence of such allegations make it "difficult to view" the plaintiffs' allegations that some entity other Barclays's clients owned the beneficial ownership rights in their mortgages "as other than conjectural or hypothetical." See id. at 86.

There is a related and independent reason that the plaintiffs' allegations of a fraudulent foreclosure scheme fail: the plaintiffs have failed to allege material misrepresentations. The impact of Rajamin on this case demonstrates that the statements in the foreclosure documents regarding who owned the mortgage notes was not material to the plaintiffs' alleged injury. The plaintiffs do not allege that they would not have had to pay the principal and interest that were due on their mortgages. They claim only that they would not have had to pay various fees, such as fees to bankruptcy and foreclosure lawyers. But there is no plausible argument that the difference in the name of the foreclosing party would have affected the amount of fees that the plaintiffs paid. The plaintiffs do not and cannot dispute that they could be required to pay some amount in fees to the foreclosing entities for costs incurred in foreclosure proceedings. And in light of Rajamin, the plaintiffs cannot meaningfully dispute that the entities entitled to foreclose on the plaintiffs' notes were Barclays's clients, based on the language in the PSAs and the fact that no other entity had even attempted to institute foreclosure proceedings even though the plaintiffs admitted they were in default.

The plaintiffs' efforts to distinguish Rajamin fail. They assert that Rajamin has no effect on this case because Rajamin

was decided under New York law while the plaintiffs in this case reside in Georgia, Massachusetts, and California. The plaintiffs argue that as a result of their residences two cases that arise under California and Massachusetts law -- Yvanova v. New Century Mortgage Corp., 365 P.3d 845 (Cal. 2016), and Juarez v. Select Portfolio, 708 F.3d 269 (1st Cir. 2013) -- should govern this analysis. However, the Rajamin court relied on New York law to interpret the effect of the PSA not because those mortgagors resided in New York or because the mortgages are secured by property in New York but because the PSAs contained an express provision that stated they were to be interpreted under New York law. Id. at 82.[3] The relevant PSAs in this case, which are at base contracts, also expressly state that they are to be governed by New York law.[4] Rajamin therefore controls the question of the impact of the PSAs here.

The plaintiffs point out that the principal issue in Rajamin was whether a mortgagor had standing to use a violation

---

[3] The Court of Appeals also noted that California law was the same on this issue. Id. at 91.

[4] See Pooling and Servicing Agreement § 11.04 (Nov. 1, 2005), available at https://www.sec.gov/Archives/edgar/data/1345452/000088237705003521/d397111_exh4-1.htm; Pooling and Servicing Agreement § 10.03 (Nov. 1, 2005), available at https://tss.sfs.db.com/investpublic/servlet/web/ReportDownload?value=PSA,PDF,03/01/2010,MS05X4,O; Pooling and Servicing Agreement § 10.03 (June 1, 2004), available at https://www.sec.gov/Archives/edgar/data/1295725/000091412104001357/mo7 82495-ex4.txt; Pooling and Servicing Agreement § 10.03 (Aug. 1, 2003), available at https://tss.sfs.db.com/investpublic/servlet/web/ReportDownload?value=PSA,PDF,03/01/2010,MS03C9,O; see also Dkt. No. 124 nn.1, 2.

of the PSA to challenge a foreclosure whereas here the principal

issue is whether the foreclosures were fraudulent. They also

assert that the damages sought in Rajamin were the principal and

interest paid on the mortgages whereas the damages sought here

were the fees paid in connection with the foreclosures. As an

initial matter, the portion of Rajamin relevant to this case

assumed that "standing exists for challenges that contend that

the assigning party never possessed legal title." Rajamin, 757

F.3d at 90 (quoting Woods v. Wells Fargo Bank, N.A., 733 F.3d

349, 354 (1st Cir. 2013)). In any event, any differences between

the principal arguments and damages sought in Rajamin and those

argued and sought in this case do not undermine the impact of

Rajamin. The relevant holding in Rajamin is broad: in the

context of securitized mortgage loans transferred to a trust

pursuant to a PSA with the language quoted above, New York law

looks to the effective date of the PSA -- and no other date --

to determine when a valid mortgage assignment occurs. Id. at 91.

There is no indication in Rajamin that this holding was limited

to the specific context of a standing dispute or a case where

the plaintiff sought only damages in the form of principal and

interest on the mortgage loans.[5]

---

[5] Indeed this case appears to be a stronger case than Rajamin for the
immateriality of the statements at issue. The plaintiffs in this case
are not disputing that they owed the principal and interest on their
mortgages and are only contesting the ancillary fees they paid, which
appear to be unrelated to the identity of the payee of those fees.

Accordingly, Rajamin renders implausible the plaintiffs' argument that the statements in the foreclosures that the trust-assignees were the beneficial owners of their mortgages was a misrepresentation solely because foreclosures were initiated before the assignments were recorded. Barclays's motion to dismiss the RICO claims insofar as they arise out of the "fraudulent foreclosure scheme" is therefore granted.[6]

**2.**

The Second Amended Complaint does not state a RICO claim with respect to the "fee shifting scheme."

The Court previously dismissed the RICO claims by Bigsby and Freeland insofar as they arose from a "fee shifting scheme" for two independent reasons: (1) because the "fee shifting scheme" as alleged by Bigsby and Freeland consisted of, at most, breaches of the mortgage loan contracts rather than fraud, and (2) because Bigsby and Freeland failed to allege scienter. Bigsby, 170 F. Supp. 3d at 573-74, 576-79. Nothing in the Second Amended Complaint warrants revisiting those conclusions.

The "fee shifting scheme" as alleged in the Second Amended Complaint still consists solely of claims for breach of contract, not fraud. The plaintiffs have not even tried to cure

---

[6] Because the plaintiffs' "fraudulent foreclosure scheme" RICO claims are dismissed for the reasons explained above, it is not necessary to address Barclays's alternative arguments for dismissal.

this defect in their complaint. They have not added any new allegations, evidence, or arguments in the Second Amended Complaint to demonstrate that the "fee shifting scheme" involved anything more than a failure to fulfill the terms of their loan documents -- a classic breach of contract claim. See Bridgestone/Firestone, Inc., 98 F.3d at 19-20. The plaintiffs' RICO claims premised on the "fee shifting scheme" therefore should be dismissed for the reasons explained in the Court's earlier decision. See Bigsby, 170 F. Supp. 3d at 576-77.[7]

Moreover, the plaintiffs' additional allegation that Fidelity and Barclays entered into an indemnity agreement does not cure their failure to allege scienter. See id. at 578-79; SAC ¶ 268. On November 10, 2008, a group of mortgagors filed a putative class action against Barclays in the Southern District of Ohio styled Kline v. Mortgage Electronic Security Systems, No. 08-cv-408. SAC ¶¶ 146, 204. The Kline plaintiffs alleged that Barclays agreed to use fees charged to mortgagors in

---

[7] The plaintiffs assert that the Court was wrong in its prior decision to conclude that the "fee shifting scheme" alleges a breach of contract claim rather than a fraud claim. It is settled law that a contracting party cannot be held liable for fraud in a suit by a counterparty to the contract as a result of a failure to perform a promise in the contract unless the defendant never intended to keep its promise when it entered into the contract. See BNSF Ry. Co. v. San Joaquin Valley R.R. Co., No 08-cv-1086, 2011 WL 3328398, at *6 (E.D. Cal. Aug. 2, 2011); Edlow v. RBW, LLC, No. 03-cv-12133, 2010 WL 2034772, at *7 (D. Mass. May 21, 2010); Lumpkin v. Deventer N. Am., Inc., 672 S.E.2d 405, 408 (Ga. Ct. App. 2008). The plaintiffs have failed to allege that Barclays never intended to keep its promise when it agreed to the mortgage terms.

default that were earmarked "attorney's fees" to pay non-legal

entities that served as intermediaries with foreclosure

attorneys. Kline v. Mortg. Elec. Sec. Sys., No. 3:08-cv-408,

First Am. Compl. ¶¶ 2, 75, April 14, 2010, Dkt. No. 157 ("Kline

Compl.").[8] The Kline plaintiffs asserted that such agreements

constituted fee-splitting that was "impermissible," "contrary to

public policy," and in violation of applicable state law and

federal bankruptcy law. Kline Compl. ¶ 75.

Barclays and Fidelity entered into the indemnity agreement

at issue in April, 2009, some months after the Kline action was

filed. SAC ¶ 268. The agreement provides that Fidelity will

indemnify Barclays for "[a]ny allegations that the business

model employed by [Fidelity] . . . constitutes an impermissible

'fee splitting' or 'referral fee' arrangement," SAC ¶ Ex. C, in

other words, precisely the allegations in the Kline case.[9] This

indemnity agreement thus appears not to be a retroactive

---

[8] See Ndremizara v. Swiss Re Am. Holding Corp., 93 F. Supp. 3d 301, n.7
(S.D.N.Y. 2015) ("The Court may take judicial notice of pleadings
filed in other cases in deciding a motion to dismiss without
converting that motion into a motion for summary judgment." (citing
Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000))).

[9] The plaintiffs note that the Kline complaint does not specify that
Fidelity was one of the non-legal entities that received the allegedly
impermissible fees from Barclays and foreclosure counsel.
Nevertheless, it would have been entirely reasonable for the Kline
complaint to spur Barclays to enter into an indemnity agreement with
any or all of the non-legal entities it dealt with, out of concern
that similar claims might be brought in the future by plaintiffs who
claimed that Fidelity was involved in a "fee shifting scheme."

admission that the parties intended to commit fraud in assessing foreclosure fees but rather an attempt to resolve any future indemnification dispute between Barclays and Fidelity should any plaintiffs prevail in the Kline case or in any similar action. The indemnification agreement is not an admission that the allegations in the Kline lawsuit or any similar allegation had merit any more than the purchase of insurance is an admission that the insured has committed an act covered by insurance. In light of that context, the indemnity agreement fails to give rise to "a strong inference of fraudulent intent." See Shields, 25 F.3d at 1128; see also In re Veeco Instruments, Inc. Sec. Litig., No. 05-md-1695, 2007 WL 7630569, at *2 (S.D.N.Y. June 28, 2007), abrogated on other grounds by Acticon AG v. China N.E. Petroleum Holdings Ltd., 692 F.3d 34, 39 (2d Cir. 2012).

The plaintiffs argue that the mere existence of a non-fraudulent explanation for the indemnity agreement does not mean that the plaintiffs have failed to plead scienter adequately, relying on Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC, 797 F.3d 160 (2d Cir. 2015). In Loreley, the Second Circuit Court of Appeals held that the plaintiff pleaded scienter satisfactorily even though one could draw a "non-culpable inference" from the facts on which the plaintiff relied because the culpable inference the plaintiff drew from those facts was "cogent and at least as compelling as" the non-

culpable inference. Id. at 178. In this case, by contrast, the non-culpable inference that Barclays and Fidelity entered into the indemnity agreement to avoid indemnification disputes stemming from Kline or similar litigation overwhelms any purported culpable inference the plaintiffs urge. The plaintiffs have offered no cogent or compelling culpable explanation of the indemnity agreement to combat Barclays's reasonable explanation.

The plaintiffs also argue that any deficiency in their scienter allegations is academic because the Court can infer fraudulent intent from the fact that the plaintiffs suffered actual and specific harm. The plaintiffs cite three criminal RICO cases for this argument -- United States v. Guadagna, 183 F.3d 122 (2d Cir. 1999); United States v. D'Amato, 39 F.3d 1249 (2d Cir. 1994); and United States v. Starr, 816 F.2d 94 (2d Cir. 1986).

The plaintiffs' argument makes no sense. If damages alone substituted for scienter, then scienter would be unnecessary in a civil RCIO case, which always requires damages. See 18 U.S.C. § 1964(c). The plaintiffs' cases, none of which are civil cases, do not support such an untenable position. In D'Amato and Starr, the Court of Appeals reversed criminal RICO convictions because of insufficient evidence of criminal intent. D'Amato, 39 F.3d at 1256-62; Starr, 816 F.2d at 98-99. In Guadagna, the Court of Appeals concluded that the government had adduced sufficient

circumstantial evidence of fraudulent intent because it proved that the defendant brazenly lied to multiple victims when he told them that they had won a fake telemarketing contest. 183 F.3d at 131. The Court of Appeals held that a jury could take all of that evidence as circumstantial proof that the defendant "knew exactly what he was doing" when he committed the fraud. Id. The plaintiffs here have not alleged similarly strong circumstantial evidence of scienter.

Accordingly, Barclays's motion to dismiss the plaintiffs' RICO claims insofar as they arise out of the "fee shifting scheme" is granted.

### 3.

The Second Amended Complaint does not state a RICO claim with respect to the "inflated fees scheme."

The Second Amended Complaint fails to allege that Barclays defrauded the plaintiffs by charging them inflated foreclosure fees. The Second Amended Complaint alleges that Fidelity and others violated their agreements with Barclays by charging fees in excess of the limitations in the Master Servicing Agreement and retainer agreements. But there is no plausible allegation that those violations were part of a scheme by Barclays to defraud defaulting mortgagors. The Second Amended Complaint's "inflated fees scheme" might be interpreted as alleging that Barclays failed to take advantage of a discount it had

negotiated with Fidelity and others and thereby paid too much to Fidelity and other providers, or that Fidelity and others breached their agreements with Barclays by charging defaulting mortgagors in excess of the fees it had negotiated with Barclays. Neither interpretation supports the conclusion that Barclays defrauded defaulting mortgagors.

The Second Amended Complaint also fails to allege scienter with regard to the "inflated fees scheme." The Second Amended Complaint gives no indication, much less a "strong inference," that Barclays acted with fraudulent intent. See Shields, 25 F.3d at 1128. The Second Amended Complaint does not allege circumstantial evidence of scienter in the "inflated fees scheme." There are no specific allegations in the Second Amended Complaint that Barclays paid higher fees to Fidelity than it was require to pay recklessly, knowingly, or intentionally. The Second Amended Complaint does not plausibly allege any incentive for Barclays purposefully to pay higher fees to Fidelity in the expectation that Barclays could recoup those higher fees from defaulting mortgagors. It is far more plausible that Barclays simply failed to appreciate that it could have required Fidelity and others to charge lower fees in the first place. That would be negligence not reckless or intentional misconduct.

Accordingly, Barclays's motion to dismiss the plaintiffs' RICO claims insofar as they arise out of the "inflated fees scheme" is granted.

### B.

Barclays moves to dismiss the plaintiffs' common law fraud claims for the same reasons that it seeks dismissal of the federal RICO claims. Accordingly, Barclays's motion to dismiss the fraud claims is granted for the reasons explained above.

### C.

Barclays also moves to dismiss the plaintiffs' UCL claims for the substantially the same reasons it seeks dismissal of the federal RICO claims. Barclays argues that the UCL claims cannot survive because its conduct was not fraudulent. The plaintiffs counter that even if the UCL claims do not survive based on underlying fraudulent conduct, the claims should be sustained on the alternative basis that the "fee shifting scheme," the "inflated fees scheme," and the "fraudulent foreclosure scheme" were unlawful under California law.

The California UCL prohibits "any unlawful, unfair or fraudulent business act." Cal. Bus. & Prof. Code § 17200. The statute thus creates "three separate types of unfair competition": "practices that are either unfair, or unlawful, or fraudulent." Pastoria v. Nationwide Ins., 6 Cal. Rptr. 3d 148, 153 (Cal. Ct. App. 2003) (internal quotation marks omitted). The

California legislature used "sweeping language" in the UCL that it intended "to include 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " Id. (quoting Bank of the W. v. Superior Court, 833 P.2d 545, 553 (Cal. 1992)). To establish UCL claims under the "unlawful" prong, the plaintiffs must show that Barclays violated an independent statute, regulation, or case law. See, e.g., id. (holding that violations of the California Insurance Code constituted unlawful conduct under the UCL).

The plaintiffs assert that the "fraudulent foreclosure scheme" was unlawful because it involved backdating and false representations about standing. The plaintiffs do not cite any independent statute, regulation, or case law (other than the RICO statute) that they allege was violated by the "fraudulent foreclosure scheme." Moreover, as explained above, none of the representations in the foreclosure documents were false and none of the foreclosures were fraudulent because the PSAs transferred completely the beneficial interests in the mortgage notes when they became effective, regardless of when the assignments were registered. Thus, the "fraudulent foreclosure scheme" cannot support the plaintiffs' UCL claims.

The plaintiffs assert that the "inflated fees scheme" was unlawful because Barclays charged the plaintiffs fees in excess of the fees Barclays could be charged by Fidelity. Again, the

plaintiffs fail to explain what if any independent statute, regulation, or case law this scheme violated. One might strain to read this scheme to state a breach of contract claim, but even that would not constitute unlawful conduct for purposes of the UCL. See Boland, Inc. v. Rolf C. Hagen (USA) Corp., 685 F. Supp. 2d 1094, 1110 (E.D. Cal. 2010) ("A breach of contract . . . is not itself an unlawful act for purposes of the UCL."). Thus, the "inflated fees scheme" cannot support the plaintiffs' UCL claims.

The plaintiffs assert that the "fee shifting scheme" was unlawful because it violated Rule 1-320(A) of the California Rules of Professional Conduct, which generally prohibits lawyers from "shar[ing] legal fees with a person who is not a lawyer," and McIntosh v. Mills, 17 Cal. Rptr. 3d 66 (Cal. Ct. App. 2004). The plaintiffs have failed to explain how the California Rules of Professional Conduct for attorneys governs a reimbursement provision of a mortgage loan contract between the plaintiffs and Barclays's clients, neither of whom is an attorney. McIntosh is of no assistance to the plaintiffs. In that case, the court found that a fee-sharing agreement between a lawyer and a non-lawyer was unenforceable. Id. at 336-37. That is not analogous to this breach-of-contract suit between non-attorney mortgagors and non-attorney servicers of mortgage loans. In any event, the plaintiffs have pointed to no comparable case that applied the

UCL to an alleged breach of the California Rules of Professional
Conduct or any case analogous to McIntosh.

Accordingly, Barclays's motion to dismiss the plaintiffs'
UCL claims is granted.

**D.**

Barclays moves to dismiss the plaintiffs' claims of unjust
enrichment and conversion as duplicative of the breach of
contract claims.

The Federal Rules of Civil Procedure ordinarily permit a
plaintiff to plead in a single complaint alternative theories of
relief even if the theories are inconsistent with one another or
would provide duplicative relief. See Fed. R. Civ. P. 8(d);
Little v. Carlo Lizza & Sons Paving, Inc., 160 F. Supp. 3d 605,
617 (S.D.N.Y. 2016). Recent decisions from judges in this
District interpret New York law to preclude a quasi-contract
claim "when it entirely 'duplicates' other tort or contract
claims." Gordon v. Hain Celestial Grp., Inc., No. 16-cv-6526,
2017 WL 213815, at *7 (S.D.N.Y. Jan. 18, 2017) (quoting Corsello
v. Verizon New York, Inc., 967 N.E.2d 1177, 1185 (N.Y. 2012));
e.g., Digizip.com, Inc. v. Verizon Servs. Corp., 139 F. Supp. 3d
670, 682-83 (S.D.N.Y. 2015) (collecting cases). However, the
plaintiffs here bring quasi-contract claims under Georgia,
Massachusetts, and California law, not New York law. Each of
those States permits pleading quasi-contract claims as

alternatives to breach of contract claims. See Astiana v. Hain

Celestial Grp., Inc., 783 F.3d 753, 762-63 (9th Cir. 2015);

Cooper v. Charter Commc'ns Entm'ts I, LLC, 760 F.3d 103, 112-13

(1st Cir. 2014); Clark v. Aaron's, Inc., 914 F. Supp. 2d 1301,

1309 (N.D. Ga. 2012).

Accordingly, Barclays's motion to dismiss the plaintiffs'

claims of unjust enrichment and conversion is denied.

## E.

Barclays moves to dismiss the California plaintiffs' breach

of contract claims, unjust enrichment claims, conversion claims,

the California UCL claims, and the California fair debt

collection claims as time-barred by the applicable statutes of

limitations.[10]

Because the defendant bears the burden of establishing the

expiration of the statute of limitations as an affirmative

defense, a pre-answer motion to dismiss on this ground may be

granted only if it appears on the face of the complaint that the

statute of limitations has run. See Staehr v. Hartford Fin.

Servs. Grp., Inc., 547 F.3d 406, 425-26 (2d Cir. 2008).

## 1.

Under New York law, common law "claims arising in another

state are governed by that state's statute of limitations if it

---

[10] Because the Court dismisses all of the RICO claims, UCL claims, and
all of fraud claims on other grounds, it need not address Barclays's
arguments that the RICO, UCL, and fraud claims are untimely.

is shorter than New York's." Atlantica Holdings v. Sovereign
Wealth Fund Samruk-Kazyna JSC, 813 F.3d 98, 110 (2d Cir. 2016)
(citing N.Y. C.P.L.R. § 202). The parties agree that the
California plaintiffs' common law claims accrued in their home
state.

The statutes of limitations for breach of contract, unjust
enrichment, and conversion claims under California law are all
shorter than or equal to New York's. Compare N.Y. C.P.L.R.
§§ 213(2) (contract claim subject to six-year statute of
limitations), 213(1) (unjust enrichment claim subject to six-
year statute of limitations), 214(3) (conversion claim subject
to three-year statute of limitations), with Cal. Civ. Proc. Code
§§ 337(1) (contract claim subject to four-year statute of
limitations), 339(1) (unjust enrichment claim subject to two-
year statute of limitations), 338(c)(1) (conversion claim
subject to three-year statute of limitations).

The California statutes of limitations for breach of
contract, unjust enrichment, and conversion claims generally
begin to run "when a party knows or should know the facts
essential to the claim." Vishva Dev, M.D., Inc. v. Blue Shield
of Cal. Life & Health Ins. Co., 207 Cal. Rptr. 3d 185, 188 (Cal.
Ct. App. 2016); El Pollo Loco, Inc. v. Hashim, 316 F.3d 1032,
1039-40 (9th Cir. 2003) (observing that the California statute
of limitations for breach of contract claims is subject to a

discovery rule when the breach involves "fraud . . . or misrepresentation" (quoting April Enters., Inc. v KTTV, 147 Cal. Rptr. 421, 435 (Cal. Ct. App. 1983)); Strasberg v. Odyssey Grp., Inc., 59 Cal. Rptr. 2d 474, 479 (Cal. Ct. App. 1996) (observing that the California statute of limitations for conversion claims is subject to a discovery rule when "there has been a fraudulent concealment of the facts").

The California common law claims cannot be dismissed under Rule 12(b)(6) pursuant to a statute of limitations defense because it is not plain from the face of the Second Amended Complaint that they are untimely. While Barclays initiated the relevant foreclosures and charged the related fees long before 2017, the California plaintiffs allege that they did not learn of Barclays's allegedly unlawful schemes until 2016 or later -- within the applicable statutes of limitations. See SAC ¶¶ 221-22, 239-40, 259-60.

The Second Amended Complaint does not contain factual allegations sufficient to establish that the California plaintiffs should have known of Barclays's alleged fraud before they actually did. According to the Second Amended Complaint, Barclays's allegedly fraudulent conduct occurred without the plaintiffs' knowledge. The whole thrust of the "inflated fees scheme" and the "fee shifting scheme" is that Barclays caused the plaintiffs' fees to be increased and that Barclays

misappropriated supposed "attorney's fees" without the plaintiffs' knowledge. The Second Amended Complaint does not on its face make clear when the California plaintiffs should have inquired into and learned about these schemes. The Court could not make such an evidentiary finding on this motion to dismiss. Cf. Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 362 (2d Cir. 2013) ("[D]etermining whether a plaintiff had sufficient facts to place her on inquiry notice is 'often inappropriate for resolution on a motion to dismiss,' . . ." (quoting LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 154 (2d Cir. 2003)).

Barclays's motion to dismiss the California UCL claims, contract, conversion, and unjust enrichment claims as time-barred is therefore denied.

## 2.

California fair debt collection claims must be brought "within one year from the date of the occurrence of the violation." Cal. Civ. Code § 1788.30(f).

The plaintiffs allege that the "fee shifting scheme" and the "inflated fees scheme" violated the California debt collection law. SAC ¶ 344. The latest date on which the California plaintiffs allege they were charged fees pursuant to these schemes is February 22, 2010, see SAC ¶¶ 210-17, 230-35, 248-256, which means the statute for the California fair

debt collection claims ran on February 22, 2011, see Cal. Civ. Code § 1788.30. The California plaintiffs did not file their claims in this case until 2017. Indeed, plaintiffs' counsel conceded at oral argument that the California fair debt collection claims are plainly time-barred.[11]

## F.

The plaintiffs have named twenty John Doe defendants. The deadline to join new parties was December 16, 2016. See Dkt. No. 68. The plaintiffs failed to identify the John Does by that date, and indeed still have not identified any John Does. All claims against John Does are therefore dismissed.

Barclays also moves to dismiss the plaintiffs' claims for a "constructive trust" and an "accounting" on the grounds that they are equitable remedies rather than independent claims to relief. The plaintiffs failed to respond to Barclays's arguments, and therefore forfeited these claims. See Scott v. JPMorgan Chase & Co., No. 13-cv-646, 2014 WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014).

---

[11] Because plaintiffs' counsel conceded at oral argument that the California fair debt collection claims should be dismissed and the Court has resolved the balance of the defendants' statute of limitations arguments in the plaintiffs' favor, it is not necessary to address the plaintiffs' arguments that their claims are subject to tolling pursuant to American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), or equitable tolling.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, Barclays's Rule 12(b)(6) motion to dismiss is **granted in part** and **denied in part**. Barclays's motion is **granted** insofar all claims against John Does are dismissed and the RICO claims, the California UCL claims, all common law fraud claims, all constructive trust claims, all accounting claims, and the California fair debt collection claims against Barclays are dismissed. Barclays's motion is **denied** as to all of the unjust enrichment claims, conversion claims, and the California breach of contract claims.

The Clerk is directed to close the motion at docket number 109.

**SO ORDERED.**

Dated:    **New York, New York**
          **March 28, 2018**

                                    _____
                                         John G. Koeltl
                                    United States District Judge